## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ALVIN DANIEL GARCIA,

       Plaintiff,

    v.                               Civ. No. 21-337 KK

KILOLO KIJAKAZI, Acting Commissioner
the Social Security Administration,

       Defendant.

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Alvin Daniel Garcia's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 21), filed November 24, 2021. The Acting Commissioner of the Social Security Administration ("Commissioner") filed a response in opposition on February 23, 2022, and Mr. Garcia filed a reply in support on March 7, 2022. (Docs. 25, 26.) Having meticulously reviewed the entire record and the relevant law, and being otherwise sufficiently advised, the Court finds that Mr. Garcia's Motion is well-taken and should be GRANTED.

### I.    BACKGROUND AND PROCEDURAL HISTORY

Mr. Garcia is 57 years old, has a GED, and attended some community college. (AR 36–37, 82, 229.)[2] He served in the United States Marine Corps from 1986 to 1990 and was honorably discharged. (AR 37, 388, 892.) After several years on disability due to lymphoma, (AR 1338), he worked in construction from about 1996 to 2010, when he broke his femur falling from a roof.

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 9.)

[2] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on August 23, 2021. (Doc. 16.)

(AR 37, 889, 1047–48.) He has no record of any earnings after 1998, (AR 1635–38), and has not worked since he applied for SSI on December 9, 2013. (AR 53, 82–83, 92, 104.)

Mr. Garcia alleges disability due to post-traumatic stress disorder ("PTSD") and anger issues. (AR 82, 228.) He brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking reversal of the Commissioner's most recent decision denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. (Doc. 21.) This is Mr. Garcia's third appeal of the Commissioner's denial of his SSI claim in federal court. (AR 1182–84, 1506-49.)

### A. Procedural History

Mr. Garcia's claim for SSI was denied initially in May 2014 and on reconsideration in October 2014. (AR 105–08, 115–19.) At Mr. Garcia's request, Administrative Law Judge ("ALJ") Ann Farris held a hearing in September 2016, and in January 2017, she issued an unfavorable decision. (AR 11–22, 47–81, 121–23.) Mr. Garcia appealed the decision to the Appeals Council, which denied his request for review. (AR 1–4.) He then appealed to this Court, which remanded his claim in August 2018 on the Commissioner's unopposed motion. (AR 1182–84.) On remand, the Appeals Council vacated the ALJ's decision and remanded Mr. Garcia's claim for reconsideration. (AR 1192–94.)

On April 4, 2019, ALJ Farris held a second hearing. (AR 1125–49.) At this hearing, Mr. Garcia amended his alleged onset date from January 1, 2011, to December 9, 2013. (AR 82, 1129–30, 1457.) On April 22, 2019, the ALJ issued a second unfavorable decision. (AR 1106–1119.) Mr. Garcia appealed the ALJ's second denial of his SSI claim to this Court pursuant to 20 C.F.R. §§ 416.1484(d) and 422.210(a). (AR 1509.) On June 8, 2020, the Court granted Mr. Garcia's motion to reverse and remand. (AR 1506–49); *Garcia v. Saul*, No. 19-cv-580, 2020 WL 3051562 (D.N.M. Jun. 8, 2020) (Khalsa, M.J.). The Court determined that ALJ Farris had "failed to give

adequate reasons for rejecting the opinions of examining psychologist Eligio Padilla, Ph.D., regarding Mr. Garcia's work-related mental impairments." *Garcia*, 2020 WL 3051562 at *20. On July 21, 2020, the Appeals Council vacated ALJ Farris's second unfavorable decision and directed that, "upon remand, this case be assigned to another [ALJ]." (AR 1550–52.)

On January 14, 2021, ALJ Jennifer Fellabaum held a third hearing in Mr. Garcia's case. (AR 1452–82.) The ALJ heard testimony, reviewed Mr. Garcia's testimony from the two previous hearings, and received additional evidence. (AR 1452-82.) On February 16, 2021, she issued the Commissioner's third unfavorable decision. (AR 1417–44.) Mr. Garcia appealed the decision to this Court pursuant to 20 C.F.R. §§ 416.1484(d) and 422.210(a) on April 13, 2021. (Doc. 1.)

**B.  Mr. Garcia's Mental Health History**[3]

Mr. Garcia suffers from PTSD and has also been diagnosed with other psychiatric conditions including major depressive disorder and co-occurring obsessive-compulsive disorder ("OCD") and panic disorder. (AR 1390, 1420, 1723.)

*1.  Mental Health Records*

a.  Dr. Hughson's May 2014 Consultative Psychiatric Examination

On May 8, 2014, Paula Hughson, M.D., conducted a consultative psychiatric examination of Mr. Garcia. (AR 302–06.) Dr. Hughson took a clinical history, reviewed a medical record, and performed a clinical interview and mental status examination. (AR 302–06.) She noted Mr. Garcia's "[s]lightly elevated" psychomotor activity, "[f]ast pressured speech," and "[p]olite, cooperative" attitude. (AR 302.) Mr. Garcia told Dr. Hughson that he is "angry all the time,"

---

[3] In his Motion, Mr. Garcia makes no arguments regarding his physical impairments. (*See generally* Doc. 21.) The Court will therefore limit its discussion to record evidence regarding Mr. Garcia's mental impairments. Moreover, the Court assumes that the parties are familiar with this case and will only discuss record evidence relevant to this appeal. Additional discussion of the Mr. Garcia's mental health history can be found in *Garcia*, 2020 WL 3051562 at *3–*9.

"sometimes paranoid," "anxious and hypervigilant around police and gang members," "generally hypervigilant in crowds," and "a conspiracy theorist." (AR 303.) He also reported that he has "a big problem with authority." (AR 303.) He explained that because of his symptoms, he "[m]ostly stays home." (AR 303.)

Dr. Hughson recorded that Mr. Garcia's mental status exam was normal except for an "[i]rritated" mood, "[n]ot infrequent" homicidal ideation, and "[l]imited" insight. (AR 304–05.) She diagnosed Mr. Garcia with PTSD, alcohol dependence in remission, and cannabis dependence. (AR 305.) Dr. Hughson assessed his symptoms and impairment to be "[m]oderate," but noted that his "rehabilitation needs" were "complex" because "his fairly rigid ways of thinking would present a considerable impediment to treatment." (AR 305.)

### b.  Dr. Padilla's June 2017 Consultative Psychological Evaluation

On June 19, 2017, Eligio Padilla, Ph.D., performed a consultative psychological evaluation of Mr. Garcia. (AR 36–43.) Dr. Padilla interviewed Mr. Garcia and administered the Mini-Mental Status Examination ("MMSE"), the Post-Traumatic Stress Disorder Checklist-Civilian Version ("PCL-C"), the Beck Depression Inventory ("BDI-II"), the Wechsler Adult Intelligence Scale ("WAIS-IV"), and a mental status exam. (AR 36.) Dr. Padilla also reviewed medical records and Mr. Garcia's September 2014 Adult Function Report. (AR 36.)

Dr. Padilla found Mr. Garcia's PLC-C score to be consistent with PTSD and his BDI-II score with severe major depression. (AR 38.) The WAIS-IV showed Mr. Garcia to have average cognitive functioning, high average verbal reasoning, and low average nonverbal reasoning. (AR 1671.) The testing further showed that Mr. Garcia's ability to sustain attention, concentrate, and exert mental control was in the average range, and he had an average ability to process simple or routine visual material. (AR 42.) In the mental status exam, Dr. Padilla assessed Mr. Garcia as

having impaired judgment and decision-making, limited insight, dysphoric mood and affect, loud and mildly pressured speech, and intrusive, disturbing thought content. (AR 40.) He also found "[p]reoccupations: problems with authority." (AR 40.)

Mr. Garcia told Dr. Padilla that he has suicidal thoughts "[a] couple of times a month," is "easily angered," and "will sometimes fantasize about how he would use his Marine Corps training to murder rude people," though he "denied any intent to kill anyone." (AR 38.) Dr. Padilla recorded that Mr. Garcia rehearsed with a heavy metal band once a week and performed six to eight times per year, "but he can only tolerate a couple of hours of performing. He does not interact with audience members prior to or after the performance." (AR 39.) Dr. Padilla also noted Mr. Garcia's preference for "solitary activities," including exercising, playing video games, and surfing the Internet. (AR 39.)

Dr. Padilla diagnosed Mr. Garcia with chronic PTSD and severe, recurrent major depressive disorder. (AR 43.) He observed that Mr. Garcia's efforts at mental health treatment had been "infrequent and inconsistent," and that he had tried various medications but "found the side effects to be intolerable." (AR 39.) Dr. Padilla recommended that Mr. Garcia consider returning to the United States Department of Veterans Affairs ("VA") for "intensive care," knowing "that addressing his PTSD and depression will take a lot of time." (AR 40, 43.)

c.   Dr. Padilla's March 2019 Consultative Psychological Evaluation

On March 6, 2019, Dr. Padilla conducted a second psychological evaluation of Mr. Garcia. (AR 1382-92.) Dr. Padilla interviewed Mr. Garcia again, re-administered the MMSE, PCL-C, BDI-II, WAIS-IV, and a mental status exam, and reviewed medical records and Mr. Garcia's September 2014 Adult Function Report. (AR 1382-83.)

Dr. Padilla noted that Mr. Garcia's reported history was "consistent with what he [had] shared" in 2017. (AR 1383.) Dr. Padilla also noted many of the same symptoms Mr. Garcia had previously reported, including problems with authority, anger, homicidal and suicidal thoughts, a BDI-II score that was "a bit lower" but "still suggest[ive of] severe major depression," and "social withdrawal and isolation as the primary way of coping with ... stressors." (AR 1386, 1388, 1391.)

Mr. Garcia's performance on the WAIS-IV test was consistent with his 2017 results. (AR 1389.) In the mental status exam, Dr. Padilla found "normal cognitive functioning" and characterized Mr. Garcia's attention, concentration, and memory as "grossly intact." (AR 1387–88.) However, he again assessed Mr. Garcia's judgment and decision-making as "impaired by PTSD and depression" and his insight as "limited." (AR 1388.) Dr. Padilla found Mr. Garcia's attitude to be cooperative, his mood and affect dysphoric, his speech "mildly pressured and loud," and his thought content "intrusive, disturbing ... [and] trying (typically unsuccessfully) to control his symptoms." (AR 1388.) Also, Dr. Padilla again noted "[p]reoccupations: problems with authority." (AR 1388.)

Dr. Padilla recorded Mr. Garcia's report that he "enjoys rehearsing with his friends once a week" and performing with a band six to eight times per year but "can only tolerate a couple of hours of performing." (AR 1387.) Mr. Garcia also told Dr. Padilla that he "spend[s] much of his day at his computer, frequently getting up to stretch because of pain in his leg and back and because intrusive, disturbing thoughts disrupt his concentration." (AR 1387.) Dr. Padilla described Mr. Garcia's "efforts at treatment for his PTSD" as "inconsistent and not particularly effective." (AR 1387.)

As in 2017, Dr. Padilla diagnosed Mr. Garcia with chronic PTSD and recurrent, severe major depressive disorder. (AR 1390.) He recommended that Mr. Garcia "seriously consider"

inpatient treatment at the VA, "which might take six months or more." (AR 1391.) Dr. Padilla found that "[w]hen [he] feels irritable (which is almost all the time and especially when he is not in the confines of his home[)]," Mr. Garcia's "ability to concentrate is disrupted by intrusive, disturbing thoughts, anger and aggressive impulses." (AR 1391.) He concluded:

> it is the professional opinion of this examiner that his PTSD, Major Depression and secondary symptoms of anxiety (along with chronic pain and fatigue) have disrupted Mr. Garcia's ability to concentrate and to engage in gainful employment since 2010 when he was physically injured and his psychiatric symptoms worsened to the point that he was unable to engage in gainful employment, or even part-time work.

(AR 1392.)

### d.  Dr. Hughson's December 2020 Consultative Psychiatric Examination

On December 9, 2020, Dr. Hughson performed a second consultative psychiatric examination of Mr. Garcia. (AR 1716–28.) Dr. Hughson conducted a clinical interview and mental status exam, and reviewed medical records, her 2014 report, Dr. Padilla's reports, the VA's Compensation and Pension Evaluation, Mr. Garcia's March 2014 Adult Function Report, Mr. Garcia's wife's March 2014 Third Party Adult Function Report, and ALJ Farris's second unfavorable decision. (AR 1716.) Dr. Hughson also interviewed Ms. Garcia by telephone and e-mail. (AR 1716.)

Dr. Hughson found Mr. Garcia to be polite, forthcoming, fully cooperative, "of solid average intelligence, intellectually curious, and well informed in general and about his past medical conditions and treatments in particular." (AR 1717.) However, she noted that Mr. Garcia's narrative was "somewhat disjointed," his speech "fast and pressured[,] and his associations quick and occasionally tangential." (AR 1717.) She also noted that Mr. Garcia forgot "some major events like the PTSD evaluation in 2018." (AR 1717.)

Dr. Hughson wrote that Mr. Garcia "reports constant, obsessive inner dialogue, constantly checking himself and arguing with himself, at times to the point of hearing the responses as if in a whisper. He describes his most prevalent mood as 'anger,' while at the same time stating that he is 'tired of being angry.'" (AR 1717.) Additionally, Mr. Garcia reported "'anger, anxiety, despair, depression.' Says if he gets mad first thing in the morning he stays mad the entire day…. He tries to avoid human interaction and experiences physical symptoms of anxiety 'classic fight or flight, heart pounding,' when he does make himself go to the store." (AR 1718.) Mr. Garcia also disclosed that "he did 'reconnaissance'" before coming to the consultative exam, "'looking to see if someone was around that shouldn't be there.'" (AR 1718.)

Mr. Garcia told Dr. Hughson that "he cannot tolerate the stress" of working. (AR 1718.) "And if he gets stressed, he says, he is 'just going to have to leave.' Sometimes this happens in interactions with his wife and he then might go to the Bosque 'until he is ready to come back.'" (AR 1718.) Mr. Garcia also reported "that his 'Concentration is shot.' He says he began to notice this ten years ago when he realized he was forgetting the music when playing the guitar. He also says he no longer plays either alone or with the band: 'All that is gone.'" (AR 1719.)

Per Dr. Hughson's report, Ms. Garcia described her husband

as "a complicated man" who is "aggressive" and "exhausting." She says she was frightened and close to calling an ambulance to have him taken to the VA four months ago when he "flew off the handle" after some comment she made, and kept on raging…. Asked whether she thinks he could perform any job, she says, "He can't handle anything."… Her husband, she says isolates and only minimally interacts with her or his dog. He sometimes "disappears" for days without explanation. He neglects chores around the house, and she ends up picking up the slack so as to avoid arguments. He grossly neglects the cleanliness of his personal space and at times will not shower for over a week.

(AR 1719.) According to Dr. Hughson, Ms. Garcia was "adamant that he should continue using medical cannabis, because it does tone down his aggression." (AR 1719.)

Dr. Hughson's mental status exam showed that Mr. Garcia was alert and oriented to the date, day, month, year, season, person, place, and situation. (AR 1722.) He was able to repeat three words, recall at five minutes, and do serial seven subtractions. (AR 1722.) His affect was congruent and constricted, his mood was angry, and his thought process was linear and occasionally tangential. (AR 1722.) He appeared to be of average intelligence and had fair to limited insight and limited judgment. (AR 1723.) He denied homicidal ideation but reported occasional thoughts of suicide. (AR 1723.) His thought content was intrusive, self-critical, obsessive, and violent, and he reported occasionally hearing voices, "like whispers," but ignoring them. (AR 1723.) He was "[p]reoccupied with themes of contamination," but there were "no actual delusions evident during the exam though his wife reports bizarre statements regarding new world order." (AR 1723.)

Dr. Hughson diagnosed Mr. Garcia with chronic, severe PTSD, cyclothymia with past episodes of major depression, co-occurring OCD and panic disorder, severe alcohol use disorder in sustained remission, and heavy, daily medical cannabis use. (AR 1723.) Dr. Hughson also found Mr. Garcia to have paranoid, schizotypal personality traits, and determined that he is "[c]oping with chronic anxiety, anger, despair, lack of motivation, low functioning, due to longstanding and untreated/treatment refractory mental illness and chronic substance use." (AR 723.) She further recorded "[m]ajor" symptoms and impairment "in several areas:  obsessions, anger, social isolation, personal care, limited interaction with family, unable to keep job." (AR 1723.)

In her report, Dr. Hughson also discussed her 2014 consultative examination, as well as other assessments in which Mr. Garcia was found to have a higher level of functioning. (AR 1723-28.) In this regard, she observed that Mr. Garcia had failed to report "significant instances of trauma" during her earlier examination; and, she found "similar omissions or minimizations" in other providers' records. (AR 1725-26.) Dr. Hughson determined that these omissions and

minimizations were "likely contributing factors" to the "discrepancies between reviews of records and Mr. Garcia's actual functioning." (AR 1723.) She further explained that the "persistence of [Mr. Garcia's] mental and emotional difficulties and their effect on his ability to function" warranted her more recent findings, which were consistent with the findings of Dr. Padilla, "a UNM Emeritus Professor of Psychology" with "experience evaluating approximately 1500 veterans at the [VA]." (AR 1724, 1728.)

Dr. Hughson noted that Mr. Garcia was not receiving mental health treatment but wanted to restart counseling at the VA, if possible: "[h]e says the VA is presently 'a ghost town,' but he will take 'whatever is available.[']" (AR 1720.) However, Mr. Garcia also told Dr. Hughson that "he has been avoiding going to the VA after 'an incident' with a doctor. He went in for a physical and the doctor 'stuck a Q tip into his ear' aggressively…. He says he barely avoided 'reacting.'" (AR 1718.) Dr. Hughson recommended "the assignment of a VA case manager … to hopefully help him access appropriate residential treatment where his complex problems could be most effectively addressed." (AR 1728.)

### 2. January 2021 Hearing Testimony

At the January 2021 hearing, Mr. Garcia testified that he no longer plays in a band, stating "all that's gone. There's nothing there. The band's broke up." (AR 1461.) Asked why, he responded that "[i]t was due to COVID, and I just couldn't do it anymore. I just started getting extremely bad anxiety about going out in public and being around people." (AR 1462.) According to Mr. Garcia, he spends much of his time in his garage where he has a computer, explaining that "[w]hen I can take the stress of looking on the net, I look at it. I spend most of my time in there. I try to work on stuff and just try to kind of rest. It's a safe place mostly." (AR 1463.) He added that "if the weather's good," he takes "walks down at the Bosque and … just stay[s] gone all day." (AR

1462–63.) He explained that he keeps "off the trails away from anything and everybody," and if he sees other people, he "avoid[s] them" and "escape[s] and evade[s]." (AR 1463.)

Mr. Garcia testified that he needs his wife to remind him "to get in the shower and put on clean clothes," and he will "go days or weeks without changing." (AR 1467.) He indicated that his wife does all the household chores because she says he is "critical" and she does not want his help. (AR 1468.) According to Mr. Garcia, he "can't seem to concentrate really on anything" and he no longer reads books because his "attention span is gone." (AR 1468.) He also testified that he "spend[s] most of the day trying to calm [him]self and meditate. And not think of bad things or bad scenarios or what could happen." (AR 1468.)

Mr. Garcia explained that he uses medical cannabis to treat his mental health disorders, which helps his sleep and appetite. (AR 1464.) He testified that he did not receive counseling in 2018 and 2019 because he "was having bad anxiety attacks" and "just wouldn't engage with anybody or anything." (AR 1470.) He indicated that he would like to restart counseling at the VA but was having difficulty getting an appointment due to the COVID-19 pandemic. (AR 1470.) According to Mr. Garcia, his past therapy at the VA "was helpful" but also "caused a lot of trouble." (AR 1465-66.) He further noted that the VA is "always hit and miss," and at a recent appointment, he "got assaulted by a physician" who "jammed" a Q-tip in his ear and "deafened" him for three days. (AR 1469–70.)

### 3. Consultative Examiners' Opinions

#### a. Dr. Padilla's Opinions

On July 10, 2017, Dr. Padilla completed a "Medical Assessment of Ability to do Work-Related Activities (Mental)" form, assessing Mr. Garcia's work-related mental limitations from August 2013 to the current examination. (AR 44–45.) Dr. Padilla opined that Mr. Garcia was

*markedly* limited in his ability to: (1) sustain an ordinary routine without special supervision; (2) work in coordination with or proximity to others without being distracted by them; (3) complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and, (7) respond appropriately to changes in the workplace.[4] (AR 44–45.)

On March 18, 2019, Dr. Padilla completed a second "Medical Assessment of Ability to do Work-Related Activities (Mental)" form, recording Mr. Garcia's limitations from before December 9, 2013 to the current examination. (AR 1407–08.) Dr. Padilla assessed Mr. Garcia to be *markedly* limited in his ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for two-hour segments; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or proximity to others without being distracted by them; (6) complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without unreasonably long or numerous rest periods; (7) interact appropriately with the general public; (8) accept instructions and respond appropriately to criticism from supervisors; (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (10) maintain socially

---

[4] Dr. Padilla also opined that Mr. Garcia was *moderately* limited in the abilities to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for two-hour segments; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; (4) maintain socially appropriate behavior; and, (5) set realistic goals or make plans independently of others. (AR 44–45.)

appropriate behavior and adhere to basic standards of neatness and cleanliness; (11) respond appropriately to changes in the workplace; and, (12) set realistic goals or make plans independently of others.[5] (AR 1407–08.)

b. Dr. Hughson's Opinions

On May 8, 2014, Dr. Hughson completed a "Statement of Opinion of Abilities (Psychiatric Only)," in which she opined that Mr. Garcia had only mild or moderate limitations. (AR 300.) However, on December 9, 2020, Dr. Hughson completed a second "Statement of Opinion of Abilities (Psychiatric Only)," in which she opined that Mr. Garcia was *markedly* impaired in his ability to: (1) understand and remember detailed or complex instructions; (2) carry out instructions; (3) attend and concentrate; (4) work without supervision; (5) interact with the public; (6) interact with coworkers; (7) interact with supervisors; and, (8) adapt to changes in the workplace.[6] (AR 1729.)

On December 16, 2020, Dr. Hughson completed a "Medical Assessment of Ability to do Work-Related Activities (Mental)" form, recording Mr. Garcia's limitations "from at least May 8, 2014, to current examination." (AR 1731 (emphasis omitted).) Dr. Hughson opined that Mr. Garcia has *marked to extreme* limitations in his ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for two-hour segments; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or proximity

---

[5] Dr. Padilla also found Mr. Garcia to be *moderately* limited in the ability to ask simple questions or request assistance. (AR 1408.)

[6] Dr. Hughson also opined that Mr. Garcia was *mildly to moderately* limited in his ability to: (1) understand and remember very short and simple instructions; (2) be aware of normal hazards and react appropriately; and, (3) use public transportation or travel to unfamiliar places. (AR 1729.)

to others without being distracted by them; (6) complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without unreasonably long or numerous rest periods; (7) interact appropriately with the general public; (8) accept instructions and respond appropriately to criticism from supervisors; (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and, (10) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (AR 1731.)

Dr. Hughson also opined that Mr. Garcia is *markedly* limited in his ability to respond appropriately to changes in the workplace and set realistic goals or make plans independently of others, and *moderately* to *markedly* limitations in his ability to make simple work-related decisions.[7] (AR 1731.) On the assessment form, Dr. Hughson commented that "Mr. Garcia historically tends to appear more capable during medical/psychiatric interviews," and that his ability to concentrate and persist is "likely to be suddenly affected by anxiety/panic and or medical cannabis withdrawal." (AR 1731.)

### C. ALJ Fellabaum's Decision

In her February 16, 2021 decision, ALJ Fellabaum applied the Commissioner's five-step evaluation process.[8] (AR 1417-44.) At step one, the ALJ determined that Mr. Garcia "has not

---

[7] Dr. Hughson further recorded *moderate* limitations in Mr. Garcia's ability to: (1) ask simple questions or request assistance, (2) be aware of normal hazards and take adequate precautions; and, (3) travel in unfamiliar places or use public transportation. (AR 1731.)

[8] The five-step sequential evaluation process requires the ALJ to determine whether:

1) the claimant engaged in substantial gainful activity during the alleged period of disability;

2) the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement;

3) any such impairment meets or equals the severity of a listed impairment described in Appendix 1 of 20 C.F.R. Part 404, Subpart P;

4) the claimant can return to his past relevant work; and, if not,

engaged in substantial gainful activity since April 4, 2019, the amended alleged onset date."[9] (AR 1419.) At step two, the ALJ found that Mr. Garcia has the severe impairments of PTSD, mood disorder, anxiety, and left hearing loss. (AR 1420.) The ALJ also determined that Mr. Garcia's hepatitis, cirrhosis, substance use disorder, history of right hip fracture, and non-Hodgkin's lymphoma in remission are non-severe. (AR 1420.) At step three, the ALJ found that Mr. Garcia's impairments do not meet or medically equal the severity of one of the Listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (AR 1420-23.) However, in her step-three analysis, the ALJ found that Mr. Garcia has a marked limitation in interacting with others. (AR 1421.)

At step four,[10] the ALJ found that Mr. Garcia has the residual functional capacity ("RFC")

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can never climb ladders, ropes, or scaffolds, or be exposed to unprotected heights or hazardous machinery. He cannot operate a motor vehicle for commercial purposes. He can perform simple, routine tasks with no fast-paced production work. He can make simple work decisions. The work should be performed in the same location every day. He can occasionally interact with co-workers and supervisors, but rarely, defined as less than 5% of the workday, interact with general public. He cannot perform tandem or team tasks. He can attend and concentrate for 2 hour segments when the work is performed within the context of

---

5)   the claimant is able to perform other work in the national economy, considering his residual functional capacity, age, education, and work experience.

20 C.F.R. § 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

[9] Throughout her decision, the ALJ incorrectly identified Mr. Garcia's alleged onset date as April 4, 2019, rather than December 9, 2013. (AR 1419, 1424, 1442, 1457; Doc. 21 at 4.) However, Mr. Garcia does not argue that this error warrants remand, and courts have held that "an error in the alleged onset of disability is not itself a basis for remand, unless the Plaintiff can show that it caused [him] prejudice[.]" *Ehrob v. Comm'r of Soc. Sec.*, No. 09-cv-13732, 2011 WL 977514, at *6 (E.D. Mich. Mar. 17, 2011) (citing cases). Thus, the Court will not remand on this basis.

[10] Step four involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine what is "the most [the claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. § 416.945(a)(1). This is the claimant's residual functional capacity. Second, the ALJ must determine the physical and mental demands of the claimant's past work. *Winfrey*, 92 F.3d at 1023. Third, the ALJ must determine whether the claimant is capable of meeting those demands given his residual functional capacity. *Id.* A claimant who can perform his past relevant work is not disabled. 20 C.F.R. § 416.920(f).

the above limitations. The noise level of the work environment should be moderate or less. He can occasionally do work involving the telephone.

(AR 1423–24.) The ALJ then determined that Mr. Garcia has no past relevant work. (AR 1442.)

At step five, the ALJ found that, "[c]onsidering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform." (AR 1442.) In making this determination, the ALJ relied on the vocational expert's ("VE") testimony that a hypothetical individual with Mr. Garcia's age, education, work experience, and assigned RFC would be able to perform the representative occupations of lab equipment cleaner, floor waxer, and wall cleaner, all of which are categorized as unskilled and medium in exertional demand. (AR 1443.) The ALJ therefore concluded that Mr. Garcia "has not been under a disability, as defined in the Social Security Act, since December 9, 2013, the date the application was filed[.]" (AR 1443.)

## II.   STANDARD OF REVIEW

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied correct legal standards to evaluate the evidence. 42 U.S.C. §§ 405(g); 1383(c)(3); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).

The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record. *Hamlin*, 365 F.3d at 1214. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). It is "more than

a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

"A decision is not based on substantial evidence if it is overwhelmed by other evidence in the

record[,]" *Langley*, 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966

F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include

"anything that may undercut or detract from the ALJ's findings in order to determine if the

substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient

basis to determine that appropriate legal principles have been followed is grounds for reversal."

*Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted).

Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate

that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting

[her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely

upon, as well as significantly probative evidence [she] rejects." *Clifton v. Chater*, 79 F.3d 1007,

1009-10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set

out [her] specific findings and [her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

### III.   DISCUSSION

Mr. Garcia argues that the ALJ erred in rejecting the opinions of Drs. Padilla and Hughson

that he is markedly to extremely limited in his ability to interact appropriately and effectively with

coworkers and supervisors.[11] (Doc. 21 at 11–26.) The Commissioner responds that the ALJ's

---

[11] Mr. Garcia takes the position that the ALJ erred in evaluating all of Dr. Padilla's opinions and all of Dr. Hughson's December 2020 opinions. (Doc. 21 at 11-26.) The Court will not address Mr. Garcia's arguments regarding the other opinions of these providers, because the ALJ's alleged errors in evaluating this evidence may be affected on remand. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003). In addition, Mr. Garcia argued in his Motion that the ALJ lacked the authority to adjudicate his claim under *Seila Law LLC v. Consumer Financial Protection Bureau*, —

rejection of these opinions is supported by substantial evidence and that the ALJ justified her rejection with "several valid and well-supported considerations." (Doc. 25 at 19-20.) For the reasons discussed below, the Court finds that Mr. Garcia's arguments are well taken and remand is warranted.

"[W]hen assessing a plaintiff's RFC, an ALJ must explain what weight is assigned to each [medical source] opinion and why." *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1157 (D.N.M. 2016). Also, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8P, 1996 WL 374184, at *7 (Jul. 2, 1996). Medical source opinions must be weighed using the factors set forth in 20 C.F.R. § 416.927(c),[12] *i.e.*, (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. Of course, "not every factor … will apply in every case," SSR 06-03P, 2006 WL 2329939, at *5 (Aug. 9, 2006), and the ALJ is not required to expressly apply every factor in weighing an opinion. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Nevertheless, the ALJ must provide "good reasons" for the weight she gives a medical source opinion, and where she fails to do so, the case must be remanded. *Frantz v. Astrue*, 509 F.3d 1299, 1302-03 (10th Cir. 2007); *Oldham*, 509 F.3d at 1258; *Haga v. Astrue*, 482 F.3d 1205, 1207-09 (10th Cir. 2007); *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *see also Givens v.*

---

U.S. —, 140 S. Ct. 2183 (2020). (Doc. 21 at 26-27.) However, he conceded this argument in his reply, (Doc. 26 at 1), so the Court will not consider it.

[12] The SSA uses a revised framework for the evaluation of medical source opinions in claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); 20 C.F.R. §§ 416.927, 416.920c. However, because Mr. Garcia filed his claim for SSI in 2013, (AR 82), the prior evidentiary framework applies here.

*Astrue*, 251 F. App'x 561, 568 (10th Cir. 2007) (ALJ must provide "adequate reasons" for rejecting significantly probative medical evidence concerning claimant's RFC).

Here, in both his July 2017 and March 2019 assessments, Dr. Padilla opined that Mr. Garcia is markedly limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 45, 1408.) Likewise, in her December 2020 assessment, Dr. Hughson opined that Mr. Garcia is markedly to extremely limited in his ability to perform these functions. (AR 1731.) The ALJ rejected these opinions,[13] finding instead that Mr. Garcia has marked social interaction limitations "only with respect to … the general public."[14] (AR 1436, 1438.)

To support her rejection of Dr. Padilla's and Dr. Hughson's opinions regarding Mr. Garcia's social interaction limitations, the ALJ referred to Mr. Garcia's "reported activities and his objective mental status exams," (AR 1436, 1438), and recited a long list of evidence, *i.e.*:

> The claimant alleges he avoids people to help manage his symptoms, and is always angry, but there were no specific triggers for her [sic] symptoms. Despite these reported symptoms, he testified that if the weather is good, he goes out for walks in the park. He testified that he plays bass in a band and practices with them. At the hearing in September 2016, he testified that he performs with the band six to eight times a year, and never for more than two hours. At that [sic] hearing in January 2021, he testified he no longer plays with the band due to COVID-19, not because of his impairments. He also testified that he talks to his brother on the phone every day. In September 2016, he reported it was easier getting out around others, and his mental status exam showed he had anxious affect, but his mood was euthymic and

---

[13] Overall, the ALJ gave Dr. Hughson's May 2014 opinions "partial weight" but her December 2020 opinions "little weight," (AR 1434, 1436), even though Dr. Hughson indicated in her later report that her earlier report was "missing important information," which she described at some length. (AR 1724-28.) The ALJ did not mention Dr. Hughson's detailed explanation for why her opinions had changed, nor did the ALJ discuss why she tacitly rejected this explanation by assigning more weight to Dr. Hughson's earlier opinions than to her later opinions. (AR 1417-44.)

[14] Elsewhere in her decision, the ALJ further explained that she "accommodated [Mr. Garcia's] marked limitations interacting with others by limiting him to occasional [sic] interacting with co-workers and supervisors, but rarely interacting with the general public," and by excluding "tandem or team tasks." (AR 1422.)

he was cooperative and calm, and had normal speech. In June 2017, he reported playing bass in a heavy metal band and he enjoys rehearsing with his friends once per week. He said they actually perform "six to eight times a year," but he can only tolerate a couple of hours of performing. He said he does not interact with audience members and prefers solitary activities, like exercising, practicing his guitar, playing video games, and surfing the "propaganda" on the internet. In a mental status exam, he had dysphoric mood, confluent [sic] affect, his speech was mildly pressured and loud, but normal in fluency and articulation. He had intrusive and disturbing thoughts and preoccupations with authority. However, he had normal cognitive functioning, his grooming and hygiene were neat, [and] his motor activity was normal.

In May 2018, he reported having one close friend and talking to him daily. He said he gets together with some guys in a band about once a month. He reported having good relationships with his family members and interacting with them on Facebook. He said his last physical altercation was in 2002, his las [sic] verbal altercation was two to three years ago, and his last road rage incident was about five years ago. He said his last panic attack was a year ago, and his last "full panic attack," was in 2005. His mental status exam showed he reported having anxious mood, but his mood appeared euthymic, he made good eye contact, was cooperative, and his affect was broad. His psychomotor activity and speech were normal. He reported believing in conspiracy theories, but had no gross indication of a thought disorder. In March 2019, he again reported playing with his band in public a few times per year, but said he does not interact with the audience. He reported enjoying rehearsing with his friends in the band once per week. He complained of being highly anxious while driving. He had dysphoric mood and affect, but his eye contact was unremarkable and he was cooperative. He still had intrusive and disturbing thoughts and preoccupations, but his attention and concentration were grossly intact, his recall/memory were grossly intact, and his fund of knowledge and intelligence were grossly intact. In December 2020, he reported he calls his best friend daily. In a mental status exam, he reported his mood as "angry," and he had constricted affect, but he was polite, forthcoming, and fully cooperative[.][15]

(AR 1436–37, 1438–39 (citations omitted).) As explained below, this recitation of "mental status exams" and "reported activities," though lengthy, is inadequate to support the ALJ's rejection of Dr. Padilla's and Dr. Hughson's opinions regarding Mr. Garcia's social interaction limitations, because it is ambiguous, omits any explanation of the ALJ's reasons for rejecting significantly

---

[15] The ALJ repeated this extensive recitation verbatim five times in her decision. (AR 1421-22, 1433, 1434-35, 1436-37, 1438-39.)

probative contradictory evidence, and at times mischaracterizes the record or is otherwise unsupported by substantial evidence.

Initially, many of the listed mental status exam findings are abnormal, which renders the ALJ's recitation ambiguous. For example, the ALJ listed findings that Mr. Garcia's affect was "anxious," "dysphoric," and "constricted," his mood "dysphoric" and "angry," his speech "mildly pressured and loud," and his thoughts "intrusive," "disturbing," and "preoccup[ied] with authority," and that he held beliefs about conspiracy theories. (AR 1436-37.) Nor did the ALJ explain how these findings, though abnormal, nevertheless undercut Dr. Padilla's and Dr. Hughson's opinions. (AR 1436-37.)

The ALJ also failed to explain why she apparently discounted other abnormal mental status exam findings in rejecting these providers' opinions, *e.g.*, that Mr. Garcia had "limited" and "impaired" judgment, "limited" insight, and "impaired" decision-making; that to avoid potential conflict he almost always stays home; that he presented to Dr. Hughson in December 2020 with "dried mud caked on his shoes"; that his speech was "fast" and "emphatic," his narrative "somewhat disjointed," his associations and thought process "occasionally tangential," and his responses "rushed"; that he "reports constant, obsessive inner dialogue"; that his thought content was "self-critical," "obsessive," and "violent"; and, that he had "[o]ccasional thoughts of suicide" and "[o]ccasionally hears voices." (AR 1388, 1669, 1717, 1722-23.) The ALJ's failure to explain her apparent rejection of this significantly probative evidence further obscures her reasons for rejecting the opinions of Drs. Padilla and Hughson regarding Mr. Garcia's social interaction limitations.

The ALJ's recitation of mental status exam findings is also ambiguous because many of the listed findings do not obviously or directly pertain to Dr. Padilla's and Dr. Hughson's rejected

opinions regarding Mr. Garcia's ability to interact with coworkers and supervisors. Findings regarding Mr. Garcia's mood, affect, cognitive functioning, psychomotor activity, attention, concentration, memory, fund of knowledge, and intelligence appear to pertain to work-related mental abilities other than "social interaction" abilities. (AR 44-45, 1407-08, 1731.) And findings regarding his grooming, hygiene, speech, and eye contact appear to pertain to "social interaction" abilities other than the abilities to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.[16] (AR 45, 1408, 1731.) Yet, the ALJ failed to explain why these findings nevertheless undercut the opinions of Drs. Padilla and Hughson that Mr. Garcia is markedly to extremely limited in his ability to interact appropriately and effectively with coworkers and supervisors. In sum, without further explanation, the ALJ's recitation of mental status exam results findings is inadequate to justify her rejection of the opinions in question.[17]

As noted above, the ALJ also listed "reported activities" to support her rejection of the opinions of Drs. Padilla and Hughson regarding Mr. Garcia's social interaction limitations. (AR 1436-39.) Specifically, the ALJ listed Mr. Garcia's (1) activities in a band, (2) interactions with his family and friend, (3) behavior during medical appointments, and, (4) walks in the bosque. (AR 1436-39.) However, as explained below, the ALJ's reliance on these activities is also inadequate to support her rejection of the opinions at issue.

---

[16] For example, findings regarding Mr. Garcia's grooming and hygiene appear to pertain to his ability to "adhere to basic standards of neatness and cleanliness." (AR 45, 1408, 1731.)

[17] The ALJ also failed to mention or explain her rejection of Dr. Hughson's criticism of the previous ALJ's reliance on "cursory mental status checklists over six, 15[-]minute office visits with a cannabis dispenser" and Dr. Hughson's own "outdated 2014 limited [m]ental [s]tatus [e]xam missing important information," instead of "the well-researched [VA] PTSD rating instrument" Dr. Padilla used. (AR 1728.)

First, the Court has already found that Mr. Garcia's band activities are inadequate to justify rejecting Dr. Padilla's opinion that Mr. Garcia is markedly limited in his ability to interact with coworkers and supervisors. Specifically, the Court explained that,

> according to Dr. Padilla, a "marked" limitation "precludes the individual's ability usefully to perform the designated activity *on a regular and sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent schedule.* The individual cannot be expected to function independently, appropriately, and effectively on a regular and sustained basis." Mr. Garcia's once-a-week rehearsals with other band members and six- to eight-times-a-year public performances fall well short of showing that Mr. Garcia can usefully interact with coworkers ... 8 hours a day, 5 days a week or on an equivalent schedule, and thus do not contradict Dr. Padilla's opinions that he is unable do so.

*Garcia*, 2020 WL 3051562 at *15 (emphasis in original) (citations omitted). And, "none of Mr. Garcia's [band] activities demonstrate any ability to interact with supervisors ... much less an ability to do so on a regular, sustained basis." *Id.*

Dr. Hughson's definition of a "marked" to "extreme" limitation does not meaningfully differ from Dr. Padilla's definition of a "marked" limitation.[18] (*Compare* AR 44-45 *and* AR 1407-08 *with* AR 1731.) As such, the Court's prior reasoning applies with equal force to the ALJ's present reliance on Mr. Garcia's band activities to support her rejection of Dr. Padilla's and Dr. Hughson's opinions regarding Mr. Garcia's social interaction limitations. Yet, the ALJ failed to explain why Mr. Garcia's limited band activities nevertheless undercut these providers' opinions that he is essentially unable to interact with coworkers and supervisors appropriately and effectively "on a regular and sustained basis." *Garcia*, 2020 WL 3051562 at *15.

---

[18] Specifically, the form Dr. Hughson completed defined a "marked" limitation as "[t]he claimant's functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited," and an "extreme" limitation as "[t]he claimant is not able to function in this area independently, appropriately, effectively, and on a sustained basis." (AR 1731.)

Moreover, substantial evidence does not support the ALJ's determination that, at the January 2021 hearing, Mr. Garcia "testified he no longer plays with the band due to COVID-19, *not because of his impairments*." (AR 1436, 1439 (emphasis added).) "[A]n ALJ is entitled to resolve conflicts in the record," but she may not "mischaracterize or downplay evidence to support her findings." *Bryant v. Comm'r, SSA*, 753 F. App'x 637, 641 (10th Cir. 2018). Here, Mr. Garcia testified that he no longer plays in a band "due to COVID, *and I just couldn't do it anymore. I just started getting extremely bad anxiety about going out in public and being around people*." (AR 1462 (emphasis added).) In other words, Mr. Garcia testified that he no longer plays in a band, in part, because of his impairments, and the ALJ's assertion to the contrary mischaracterizes this evidence. For these reasons, Mr. Garcia's past band activities fail to adequately support the ALJ's rejection of Dr. Padilla's and Dr. Hughson's opinions regarding Mr. Garcia's social interaction limitations.

The ALJ next listed Mr. Garcia's reported interactions with his family and friend to justify rejecting Dr. Padilla's and Dr. Hughson's opinions that he is markedly to extremely limited in his ability to interact appropriately and effectively with supervisors and coworkers. (AR 1436-39.) Specifically, the ALJ stated that "[i]n May 2018, [Mr. Garcia] reported having one close friend and talking to him daily" and "having good relationships with his family members and interacting with them on Facebook." (AR 1436-37, 1439.) The ALJ also stated that at the January 2021 hearing, he "testified that he talks to his brother on the phone every day." (AR 1436, 1439.)

Initially, the referenced evidence is inadequate to justify the ALJ's rejection of Dr. Padilla's and Dr. Hughson's opinions regarding Mr. Garcia's social interaction limitations because the ALJ failed to explain why she rejected significantly probative evidence that undercuts Mr. Garcia's positive characterization of his family relationships. For example, Mr. Garcia reported that "[h]is

dad an[d] all his sisters are 'mean and vicious,'" and his wife reported that he "scares," "[i]ntimidates," and "barely interacts with her." (AR 226, 1721-22.) Indeed, even Mr. Garcia appeared to recognize that his "generally good" relationship with his wife is due to her willingness to tolerate the symptoms of his mental health disorders, testifying that he "ha[s] a tendency to abuse" her emotionally and that they "manage to get along in spite of [him]." (AR 65, 1337, 1464.) Mr. Garcia also testified that his adopted brother is his only friend, and that though Mr. Garcia "call[s] him on the phone every day, … [they] don't hang out." (AR 1474.)

Moreover, as with Mr. Garcia's band activities, this Court has already found Mr. Garcia's interactions with others inadequate to justify rejecting Dr. Padilla's opinions regarding Mr. Garcia's social interaction limitations, explaining:

> In and of itself, the ALJ's observation that Mr. Garcia retains some ability to interact with others is supported by substantial evidence. However, … this observation does not constitute an adequate reason to reject Dr. Padilla's opinions that Mr. Garcia has marked social limitations. As Mr. Garcia observes, Dr. Padilla did not opine that Mr. Garcia is completely unable to interact with others. Rather, he opined that Mr. Garcia had "[m]arked" limitations in his abilities to interact with the general public, coworkers, and supervisors. Again, a marked limitation is one that "precludes the individual's ability usefully to perform the designated activity on a regular and sustained basis, *i.e.*, 8 hours a day, 5 days a week, or an equivalent schedule."

*Garcia*, 2020 WL 3051562 at *16 (citations omitted).

Again, Dr. Hughson's definition of a "marked" to "extreme" limitation does not meaningfully differ from Dr. Padilla's definition of a "marked" limitation. (*Compare* AR 44-45 *and* AR 1407-08 *with* AR 1731.) Thus, again, the Court's prior reasoning applies with equal force to the ALJ's present reliance on Mr. Garcia's interactions with his family and friend to reject Dr. Padilla's and Dr. Hughson's opinions regarding his social interaction limitations. Yet, again, the ALJ did not explain why Mr. Garcia's fairly restricted interactions with his family and friend nevertheless show that he can interact with coworkers and supervisors appropriately and

effectively on a regular and sustained basis. *Garcia*, 2020 WL 3051562 at *16. Therefore, this justification is also inadequate.

The ALJ next listed Mr. Garcia's behavior at medical appointments to support her rejection of the pertinent opinions, noting that he was "cooperative, "calm," "polite," and/or "forthcoming" at appointments. (AR 1436-37, 1439.) But as this Court has previously explained, "Mr. Garcia's calm, cooperative demeanor with some providers … fall[s] well short of demonstrating an ability to usefully interact with supervisors, coworkers, and/or the public 8 hours a day, 5 days a week or on an equivalent schedule." *Garcia*, 2020 WL 3051562 at *16. Yet, once again, the ALJ failed to explain why Mr. Garcia's appropriate behavior during occasional and relatively brief and controlled interactions with medical providers nevertheless indicates that he can interact with coworkers and supervisors appropriately and effectively up to two hours a day, five days a week.

Moreover, in rejecting the opinions of Drs. Padilla and Hughson regarding Mr. Garcia's social interaction limitations, the ALJ failed to discuss significantly probative evidence of difficulties Mr. Garcia encountered in maintaining appropriate behavior for even the short, isolated span of a medical appointment. For example, Mr. Garcia testified that he was "furious" when Dr. Hughson "refused to shake [his] hand" in May 2014 and consequently acted "very, very, very stiff" and "pretended … [he] was okay." (AR 1570.) And in December 2020, Mr. Garcia reported that he "barely avoided 'reacting'" when a VA doctor "'stuck a Q tip into his ear' aggressively." (AR 1718.) More generally, in December 2020, Dr. Hughson wrote that "Mr. Garcia historically tends to appear more capable during medical/psychiatric interviews," (AR 1731); and, in January 2021, Mr. Garcia testified that he is "really good at pretending to be okay" during medical appointments, "but [he's] really not." (AR 1471.) The ALJ did not explain her apparent rejection of this evidence.

In addition, the Court finds the District of Colorado's reasoning in *Jimenez v. Berryhill* persuasive on this point. *See* 300 F. Supp. 3d 1295 (D. Colo. 2018). In *Jimenez*, an ALJ rejected a medical source opinion finding social interaction limitations because the claimant was "generally noted to be pleasant and cooperative during his exams." *Id.* at 1303–04. The *Jimenez* court held that it was improper for the ALJ to rely on the claimant's interactions with healthcare providers without providing "evidence to support his conclusion that the ability to occasionally interact well with medical providers in exams correlates to an ability to interact appropriately with coworkers and supervisors." *Id.* at 1304. The court explained that without such evidence, the ALJ's determination was "mere conjecture," and "'[a]n ALJ cannot substitute her lay opinion for that of a medical professional,' or 'interpose his own 'medical expertise' over that of a physician.'" *Id.* (quoting *Lax*, 489 F.3d at 1089; *Kemp v. Bowen*, 816 F.2d 1469, 1476 (10th Cir. 1987)); *see also Hosea v. Saul*, No. 19-cv-0811, 2020 WL 5821029, at *5 (D.N.M. Sept. 30, 2020) (holding that ALJ erred in not explaining why claimant's normal behavior at medical appointments "detract[ed] from the physicians' opinions on his ability to function socially"). For all of these reasons, the Court finds that the ALJ's reliance on Mr. Garcia's calm, cooperative behavior at medical appointments is also inadequate to support her rejection of Dr. Padilla's and Dr. Hughson's opinions regarding Mr. Garcia's very limited ability to interact appropriately and effectively with coworkers and supervisors.

The final reported activity on which the ALJ relied to justify her rejection of Dr. Padilla's and Dr. Hughson's opinions regarding Mr. Garcia's social interaction limitations is Mr. Garcia's practice of going for walks in the bosque.[19] (AR 1436, 1439.) At the January 2021 hearing, Mr.

---

[19] The Court takes judicial notice that the Rio Grande Valley State Park is "locally referred to as the 'bosque,' which is Spanish for 'forest.'" https://www.cabq.gov/parksandrecreation/open-space/lands/rio-grande-valley-state-park (last

Garcia testified that he "go[es] for [his] walks down at the Bosque and … just stay[s] gone all day," adding that he keeps "off the trails away from anything and everybody," and if he sees another person, he "avoid[s] them" and "escape[s] and evade[s]."[20] (AR 1463.) It is far from clear why Mr. Garcia's practice of going for solitary walks in the woods would undercut the opinions of Drs. Padilla and Hughson regarding his social interaction limitations. Yet, the ALJ wholly failed to explain why she relied on this practice to reject the opinions in question. Because the Court cannot follow the ALJ's reasoning, this justification is inadequate. *Cf. Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012) (holding that remand was not warranted where court could "follow the adjudicator's reasoning" and "determine that correct legal standards have been applied").

In the long list of mental status exam findings and reported activities the ALJ recited to justify her rejection of the opinions at issue, she also mentioned that, in May 2018, Mr. Garcia reported that his "last physical altercation was in 2002, his las [sic] verbal altercation was two to three years ago, … his last road rage incident was about five years ago, … his last panic attack was a year ago, and his last 'full panic attack,' was in 2005."[21] (AR 1437, 1439.) However, in relying on Mr. Garcia's remote history of physical and verbal altercations, the ALJ failed to explain her apparent rejection of evidence that he has long engaged in social withdrawal to avoid such

_____

accessed Sept. 26, 2022). "The 4,300-acre park extends from Sandia Pueblo in the north through Albuquerque and south to Isleta Pueblo, and is located on both the east and west sides of the Rio Grande." *Id.*

[20] Consistently, Mr. Garcia also told VA Nurse Practitioner Cheryl Bakewell that "he goes out to the woods and basically 'hides' during the day to keep from facing anyone." (AR 1784.)

[21] The ALJ also asserted that "there were no specific triggers for [Mr. Garcia's] symptoms," (AR 1436, 1439), but in fact Mr. Garcia identified several triggers, including crowds, police, gang members, traffic, loud noises, helicopters, sirens, and the smell of diesel. (AR 54, 60-61, 303, 1132, 1261, 1708.) In addition, the ALJ mentioned Mr. Garcia's September 2016 report that "it was easier getting out around others." (AR 1436, 1439.) However, not only does this vague statement fail to undercut the opinions at issue, but also the ALJ failed to discuss why she discounted Mr. Garcia's contemporaneous report of continued irritability, anger, and homicidal ideation. (AR 320.)

altercations. (*See, e.g.*, AR 40 (June 2017, "to avoid potential conflict he stays home almost all of the time"); AR 1388 (March 2019, same); AR 1718 (December 2020, "[h]e tries to avoid human interaction"); AR 1467 (January 2021, he "ha[s] [had verbal or physical altercations] in the past, but [he] tr[ies] to avoid people at all costs these days").[22]) Also, in relying on Mr. Garcia's May 2018 report that his last panic attack was in 2017, the ALJ failed to explain her apparent rejection of evidence regarding subsequent attacks, *e.g.*, Mr. Garcia's April 2019 testimony that panic hits him once or twice a day, (AR 1572), and his January 2021 testimony that he "ha[s] to get away," feels like he is "being smothered," and finds it "[h]ard to breath" as often as "once or twice a week."[23] (AR 1475.) Because the ALJ failed to explain why she rejected this significantly probative contradictory evidence, her reliance on Mr. Garcia's May 2018 report regarding altercations and panic attacks fails to adequately justify her rejection of Dr. Padilla's and Dr. Hughson's opinions regarding Mr. Garcia's social interaction limitations.

In addition to the foregoing, the ALJ proffered two other reasons for rejecting Dr. Padilla's opinions overall, *i.e.*, the lack of a treating relationship between Dr. Padilla and Mr. Garcia, and Mr. Garcia's lack of mental health treatment. (AR 1438.) However, these additional reasons are also inadequate to justify the ALJ's rejection of the opinions in question. Regarding the first reason, the ALJ stated that,

> [a]lthough Dr. Padilla has experience evaluating veterans and has examined the claimant on two occasions, Dr. Padilla did not have a treating relationship with the

---

[22] Similarly, Mr. Garcia told Monica Horstmann, Ph.D., that when he is "startled it 'triggers the battle reflex, which can be dangerous [e.g., has punched people],'" so he avoids putting himself in "'situations where that can happen.'" (AR 893.)

[23] Notably, Mr. Garcia told Dr. Hughson in December 2020 that when he experiences panic attacks, "[h]e tries to put anxiety management skills into practice, but usually he 'has to (physically) escape'"; that "he pushed his way out at Smiths … just the other day"; and, that "he was once fired while working as a carpenter because he left during one of his panic attacks." (AR 1718, 1719, 1721.) The ALJ did not discuss this evidence in her decision. (AR 1417-44.)

claimant. The claimant saw Dr. Padilla on referral from his representatives with the motivation of getting disability benefits, not mental health treatment.

(AR 1438.) Under 20 C.F.R. § 416.927(c)(2), an ALJ should consider whether the claimant and a provider have a treating relationship in determining how much weight to give the provider's opinions. But the Tenth Circuit has explained that the lack of a treatment relationship "is not by itself a basis for rejecting [a medical source opinion]—otherwise the opinions of consultative examiners would essentially be worthless, when in fact they are often fully relied on as the dispositive basis for RFC findings." *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012). As such, the ALJ may not reject Dr. Padilla's opinion simply because he is a consultative examiner.

Furthermore, it was improper for the ALJ to consider any conjectural "motivation" Mr. Garcia may have had for seeking a consultative examination. (AR 1438.) "[U]nlike the typical judicial proceeding, a social security disability hearing is nonadversarial." *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). It is not a 'battle of experts,' in which each side hires a partisan expert witness to support its case and defeat its opponent. *See id.* Rather, in the nonadversarial context of a social security proceeding, consultative examiners serve to develop the record so that the agency can resolve the claimant's case correctly. *See Chapo*, 682 F.3d at 1291. Indeed, an ALJ has an affirmative duty to "order a consultative exam when evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability." *Hawkins*, 113 F.3d at 1169. In these circumstances, that Mr. Garcia may have believed Dr. Padilla would help to develop the record does nothing to undercut Dr. Padilla's opinions, particularly in the absence of any evidence that *Dr. Padilla's* "motivation" was in any way suspect. (AR 1438.)

Second, the ALJ relied on Mr. Garcia's lack of mental health treatment to reject Dr. Padilla's opinions, stating that Mr. Garcia "is not getting any mental health treatment and is not

taking any psychiatric medications except for medical marijuana." (AR 1438.) Elsewhere in her decision, the ALJ added that Mr. Garcia "has not provided any reasonable basis for his lack of mental health treatment despite the fact he is eligible for treatment through the VA."[24] (AR 1440.) An ALJ may properly consider a claimant's lack of treatment when determining if a medical source opinion is consistent with the record. *See, e.g.*, *Torres v. Kijakazi*, No. 20-cv-440, 2021 WL 4307201, at *8 (D.N.M. Sept. 22, 2021) ("In other words, lack of treatment is but one portion of the overall record to be considered and that could help support or undermine a medical source's opinion."). But again, an ALJ must explain her rejection of significantly probative contradictory evidence, *Clifton*, 79 F.3d at 1010, and may not "mischaracterize or downplay evidence to support her findings." *Bryant*, 753 F. App'x at 641.

Here, the ALJ failed to discuss why she apparently rejected significantly probative evidence of several reasons why Mr. Garcia did not receive mental health treatment during the specified period. In her May 2014 report, Dr. Hughson observed that Mr. Garcia's "fairly rigid ways of thinking would present a considerable impediment to treatment."[25] (AR 305.) At his April 2019 hearing, Mr. Garcia testified that "care at the VA is always haphazard," and the lack of consistency in providers is "very unnerving. It does not breed trust." (AR 1139-40.) At Dr. Hughson's December 2020 examination, Mr. Garcia reported "that he has been avoiding going to the VA after … [a] doctor 'stuck a Q tip into his ear' aggressively" and "he barely avoided 'reacting.'" (AR 1718.) At his January 2021 hearing, Mr. Garcia explained that his anxiety attacks

---

[24] In April 2019, Mr. Garcia testified that he had received counseling outside the VA in the past but his wife's insurance, which paid for it, "went away when she retired." (AR 1132.)

[25] Similarly though more generally, Dr. Padilla observed that veterans suffering from PTSD and secondary mood and substance abuse disorders are often "ambivalen[t] toward treatment … expressing the belief that symptoms will only worsen as they beg[i]n purposely thinking and talking about the traumatic events." (AR 1391, 1673.)

were a barrier to treatment in 2018 and 2019 because he "just wouldn't engage with anybody or anything." (AR 1470.) He also testified that more recently, "it's hard to get in" to counseling at the VA "due to COVID," and though he had been calling the VA every week, they did not call him back until the week of the hearing. (AR 1458, 1470.) In addition, he testified that he does not take prescription psychiatric medication because it made him suicidal, and because of his history of liver disease. (AR 1472; *see also* AR 1668 (noting that Mr. Garcia found side effects of prescription psychiatric medication "to be intolerable").) The ALJ did not discuss why she discounted this evidence in rejecting Dr. Padilla's opinions. (AR 1436-39.) Therefore, the Court cannot determine whether the ALJ applied appropriate legal standards and whether her reliance on Mr. Garcia's lack of mental health treatment is supported by substantial evidence. *See Griego v. Kijakazi*, No. 20-cv-1187, 2022 WL 35817, at *6 (D.N.M. Jan. 4, 2022) ("Given that the ALJ did not discuss why Plaintiff may have failed to obtain mental health treatment – a topic [the consultative examiner] broached in [his] report – the Court finds that … the ALJ's rationale is legally inadequate.").

Finally, even if the ALJ had proffered otherwise adequate reasons for rejecting the opinions of Drs. Padilla and Hughson regarding Mr. Garcia's social interaction limitations, these reasons would remain flawed because she did not explain why they apply to Mr. Garcia's ability to interact with supervisors and coworkers but not his ability to interact with the general public. Specifically, in assessing Mr. Garcia's RFC, the ALJ determined that Mr. Garcia was limited to interacting with the general public less than 5% of the day but could interact with coworkers and supervisors "occasionally," *i.e.*, up to about two hours in an eight-hour workday. (AR 1424); SSR 96-9P, 1996 WL 374185, at *3. But the ALJ's proffered reasons for rejecting the pertinent opinions wholly fail to justify this distinction.

32

Compounding this error, the ALJ also failed to explain why she rejected significantly probative evidence supporting the opinions of Drs. Padilla and Hughson regarding Mr. Garcia's ability to interact with supervisors, in particular. In his March 2014 Adult Function Report, Mr. Garcia indicated that he does not get along well with authority figures. (AR 215.) In her March 2014 Third Party Adult Function Report, Ms. Garcia indicated that Mr. Garcia does not get along well with authority figures and explained that he "has a problem with anyone that does not agree with him" and "[h]is actions and thoughts are always about killing someone or how to ambush the authority such as police and so on."[26] (AR 225-26 (emphasis added).) Similarly, in her September 2014 Third Party Adult Function Report, Ms. Garcia noted Mr. Garcia's "hat[]red for authority" and indicated that he "always talks about how to kill [authority figures]." (AR 242, 248.) At the September 2016 hearing, Mr. Garcia testified that he "react[s] very badly to advice" and would have problems with a supervisor closely managing him, (AR 61–62); and, Ms. Garcia testified that Mr. Garcia has problems "with authority figures and supervisors" and "you just don't" criticize him or tell him what to do. (AR 72.) And at the April 2019 hearing, Mr. Garcia explained: "I have a problem with authority. I was brought up with that. My dad was an APD officer and he showed me -- well, how you can abuse your authority." (AR 1138.)

In her May 2014 consultative examination report, Dr. Hughson recorded Mr. Garcia's report that he

> has a big problem with authority. Avoids driving on the freeway because of road
> rage leading to homicidal thoughts. Strategizes how he would kill the people

---

[26] The ALJ gave Ms. Garcia's "statements and testimony … little weight," but the reasons she gave for doing so did not address Ms. Garcia's reports about Mr. Garcia's problems with authority. (AR 1442.) Also, ALJ Fellabaum adopted ALJ Farris's reason for rejecting Ms. Garcia's report that Mr. Garcia "lied to minimize his symptoms," *i.e.*, that Mr. Garcia "discussed a wide variety of topics with his medical providers, with no indication that [he] lied to them or minimized his symptoms." (AR 1118, 1442.) However, in adopting this reasoning, the ALJ did not mention or discuss Dr. Hughson's express refutation of it, which included specific examples of instances in which Mr. Garcia did in fact minimize traumatic experiences to medical providers. (AR 1725-26.)

involved when he is confronted with police, for example at road blocks. Feels that
he is unable to work because of his problem with authority. Doesn't like being told
what to do.

(AR 303.) During a November 2014 mental health assessment at the VA, Mr. Garcia's provider

recorded that Mr. Garcia became anti-authority after witnessing a lethal helicopter crash during a

training exercise and began to believe that "[a]uthority cannot be trusted." (AR 892-93.) And in

his reports regarding Mr. Garcia's 2017 and 2019 evaluations, Dr. Padilla noted Mr. Garcia's

"[p]reoccupations" regarding his "problems with authority." (AR 40, 1400.)

The ALJ failed to explain why she discounted this extensive and significantly probative

evidence when she determined that Mr. Garcia's marked limitations in interacting with others

extended to interactions with the public but not to interactions with supervisors. (AR 1436-39.)

Her omission is problematic because the evidence suggests that, if anything, Mr. Garcia would

have *more* difficulty interacting with supervisors than with the general public, not less. Absent a

sufficient explanation on this point, the Court cannot determine that the ALJ applied correct legal

standards in rejecting the opinions of Drs. Padilla and Hughson that Mr. Garcia is markedly to

extremely limited in his ability to interact with supervisors.

## IV.   CONCLUSION

An ALJ must provide adequate reasons for the weight she gives a medical source opinion.

*Frantz*, 509 F.3d at 1302-03; *Oldham*, 509 F.3d at 1258; *Haga*, 482 F.3d at 1207-09; *Watkins*, 350

F.3d at 1300; *Givens*, 251 F. App'x at 568. Here, the ALJ failed to provide adequate reasons for

rejecting the opinions of Drs. Padilla and Hughson that Mr. Garcia is markedly to extremely

limited in his ability to accept instructions and respond appropriately to criticism from supervisors

and his ability to get along with coworkers or peers without distracting them or exhibiting

behavioral extremes. As such, the Court cannot determine whether the ALJ properly evaluated Dr.

Padilla's and Dr. Hughson's opinions and whether her rejection of these opinions was supported by substantial evidence.[27] Remand is therefore warranted. *Jensen*, 436 F.3d at 1165.

IT IS THEREFORE ORDERED that Mr. Garcia's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 21) is GRANTED, and this matter is remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

IT IS SO ORDERED.

_____

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

---

[27] Additionally, although the Commissioner has not argued harmless error, this Court has previously explained that:

> with respect to Mr. Garcia's abilities to interact with supervisors and coworkers … , Dr. Padilla opined that Mr. Garcia is more severely impaired than the ALJ's RFC appears to accommodate. Had the ALJ properly weighed Dr. Padilla's opinions regarding these impairments, she may have given them greater weight and thereby assigned Mr. Garcia a more restrictive RFC.

*Garcia*, 2020 WL 3051562 at *20. Likewise, had the ALJ properly evaluated Dr. Hughson's December 2020 opinions, she may have given them greater weight as well, leading to a more restrictive RFC. In this regard, the Court notes that at the January 2021 hearing, the ALJ asked the VE to consider a hypothetical where "the work should be isolated with only occasional supervision, [and] brief and superficial interactions with coworkers and the general public." (AR 1478.) The VE responded that she was "not sure that there's any jobs within that," and explained that there is "always some contact with the worker[']s supervisor or some contact with coworkers. So I think that takes the worker out." (AR 1479.) Thus, the ALJ's errors were not harmless. *Cf. Mays v. Colvin*, 739 F.3d 569, 578-79 (10th Cir. 2014) (failure to provide adequate reasons for rejecting a medical source opinion "involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of [RFC]").